IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NURSA, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>v.<br><br>YOUNGE AND CRANE, INC., d/b/a EDMOND HEALTH CARE CENTER, an Oklahoma corporation; OAK HILLS CARE CENTER RECEIVERSHIP, LLC, d/b/a OAK HILLS CARE CENTER, an Oklahoma limited liability company; and VOYAGE LTD, INC., d/b/a VOYAGE LONG TERM CARE, an Oklahoma corporation,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00900-RJS-CMR<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Now before the court is Defendants Younge and Crane, Inc., d/b/a/ Edmond Health Care Center, Oak Hills Care Center Receivership, LLC, d/b/a Oak Hills Care Center, and Voyage LTC, Inc. d/b/a Voyage Long Term Cares' Motion to Dismiss.[1]  For the reasons stated below, the court DENIES Defendants' Motion.

### BACKGROUND[2]

#### A.  The Nursa App

Nursa, Inc. (Nursa) is a software company that connects healthcare facilities with healthcare clinicians operating as independent contractors.[3]  Nursa provides a digital application

---

[1] Dkt. 17, *Defendants Edmond Health Care Center, Oak Hills Care Center, and Voyage Long Term Cares' Motion to Dismiss* (*Motion*).

[2] The following facts are set forth as alleged in the Complaint and the parties briefing, including the attached exhibits.

[3] Dkt. 1, *Complaint* ¶ 9.

(the App) that enables healthcare facilities and healthcare clinicians to connect to fill single job shifts that need coverage.[4]  Clinicians also use the App to apply for particular job postings.[5]  If a facility is satisfied with the applicant's credentials, it can hire the clinician to cover the needed shift.[6]

For a facility to use the App, an individual using the App on behalf of the facility must affirm they have authority to agree to Nursa's Terms of Service (TSA) on the facility's behalf.[7] The following notice is stated at the top of the TSA:

> PLEASE TAKE NOTICE THIS IS A BINDING CONTRACTUAL AGREEMENT AND BY ENTERING INTO THIS TERMS OF SERVICE AGREEMENT YOU ARE ACCEPTING, ACKNOWLEDGING, AND AGREEING TO ALL TERMS AND OBLIGATIONS AS OUTLINED BELOW.[8]

In relevant part, the TSA includes the following terms:

> ACCEPTANCE OF THIS AGREEMENT
> Age and Authority.  You must be at least 18 (eighteen) years of age to use the Nursa Platform.  By agreeing to this Agreement, by any use of the Nursa Platform, or by creating a profile in the Nursa Platform, you represent and warrant that you are at least 18 years of age, have the legal capacity and authority, consent, or agency to enter into this Agreement on behalf of yourself the Facility entity, or any other entity on behalf of whom you are signing.  We assume no responsibility or liability for any misrepresentation of your age or authority.[9]
>
> Acknowledgement.  You acknowledge that you are entering into the Agreement either by clicking "I agree" at the bottom of this Agreement, by any use of the Nursa Platform, by signing or acknowledging this Agreement, and / or creating a profile on the Nursa Platform as a Clinician or a Facility.  In doing so, you expressly acknowledge that you understand this Agreement in its entirety and accept all of its terms and conditions.  If you do not agree to be bound by the terms and conditions of this Agreement, you shall not use or access our Platform

---

[4] *Id.* ¶ 10.

[5] *Id.* ¶ 11.

[6] *Id*.

[7] *Id.* ¶ 12.

[8] *Complaint*, Ex. 1, *TSA*.

[9] *TSA* ¶ 2.1.

or any of the services provided through our Platform.  Unless otherwise designated, each term, condition, or obligation as stated herein shall apply to and be binding upon each Clinician and Facility.  You further acknowledge that your transaction or signature may not be denied legal effect because such acknowledgement or signature is conducted or executed in electronic form.  If a record or signature is required by any law, you consent that your electronic record, signature, or acknowledgment satisfies that requirement.[10]

ADDITIONAL TERMS APPLICABLE TO FACILITIES
Verification of Shift, Shift Reports.  For all completed Clinician Shifts scheduled via the Nursa Platform, Nursa agrees to document the Job ID, Clinician name, Charges, and start time, end time, and time off-shift.  Start time, end time, time-off shift and total hours worked shall be provided by the Facility and Clinicians in the Shift Report.  Nursa shall provide to Facility Shift Reports upon submission from a Clinician.  In the event that Shift Reports are not reviewed nor verified by the Facility within 48 business hours, Facility shall accept auto-verified Shift Reports.  Any such auto-verified Shift Report shall be deemed accepted by the Facility as true and correct.[11]

Charges and Invoicing.  As a user of our Platform you understand that usage may result in "Charges" to you.  Charges include the Clinician Fee as described in Section 7.3, the Service Fee as described in 7.3, any cancellation fees for a particular Shift posted by Facility, and may include additional fees, including late fees. . . .  You are responsible for reviewing and agreeing to the Charge estimate on each Shift posted by you on our Platform and you are responsible for all Charges incurred under your user account.  Any errors, omissions, or corrections contained in the invoice or to the Charges must be reported in writing to Nursa within thirty (30) days of the Shift's completion.  After thirty days, all Charges shall be deemed correct, accurate, and without objection. . . .  Cash payments are strictly prohibited.  Your payment of Charges to Nursa satisfies your payment obligations for your use of the Nursa platform and associated services.[12]

GOVERNING LAW AND CONSENT TO JURISDICTION
Other than the Arbitration Agreement, PAGA waiver, and Class Action Waiver, which shall be governed by the laws described therein, this Agreement shall be construed according to the laws of the State of Utah without regard to conflict of laws provisions thereof.  The Parties hereby submit to the jurisdiction of the state and federal courts in Salt Lake County, Utah, and agree that said courts have the sole and exclusive jurisdiction over any and all disputes and causes of action

---

[10] *TSA* ¶ 2.2.

[11] *Id.* ¶ 8.2.

[12] *Id*. ¶ 8.8.

involving such Party that arise out of or relate to this Agreement or its performance despite any venue requirement by local statute or rule.[13]

An individual cannot access or use the App, either for themselves or on behalf of a facility, without first affirmatively accepting the TSA by clicking an "I Agree" button on the page where the terms are presented to the user.[14]  After a clinician completes a shift for a facility, that facility verifies the work through the App.[15]  Each week, Nursa finalizes the charges, pays the clinician for the completed work, and invoices the facility.[16]  Under the TSA, a facility is obligated to pay Nursa for invoiced, verified clinician work.[17]

Nursa is a Delaware corporation that maintains its principal place of business in Murray, Utah.[18]  Nursa executes its TSA agreements with facilities electronically from Utah.[19]  Whenever a facility accepts a shift through the App, confirmation is sent to Nursa in Utah.[20]

### B.  Defendants' Use of the App

Voyage LTC, Inc. (Voyage) is an Oklahoma corporation that manages nursing homes in the Oklahoma City Metropolitan Area in the state of Oklahoma.[21]  Brad Underwood is the chief executive officer and owner of Voyage.[22]  At all relevant times, Voyage managed Edmond Health Care Center (Edmond) and Oak Hills Care Center (Oak Hills).[23]  Edmond is a d/b/a of

---

[13] *Id*. ¶ 20.1.

[14] *Complaint* ¶ 18.

[15] *Id*. ¶ 39; TSA ¶ 8.2.

[16] *Complaint* ¶¶ 27, 40.

[17] *Id*. ¶ 28.

[18] *Id*. ¶ 4.

[19] *Id.*

[20] *Id*. ¶ 42.

[21] *Motion* ¶¶ 4-5.

[22] Dkt. 31-1, *Declaration of Kip McElwee* (*McElwee Declaration*) ¶ 12.

[23] *Complaint* ¶¶ 33–34.

Young and Crane, Inc., an Oklahoma corporation, that has its principal place of business in Edmond, Oklahoma.[24] Oak Hills is a limited liability company that is domiciled in Oklahoma and maintains its principal place of business in Jones, Oklahoma.[25] All Defendants operate solely in Oklahoma and "have never transacted business outside of the State of Oklahoma."[26] All clinical work performed for Defendants through the App was performed in the state of Oklahoma.[27]

Voyage represented to Nursa on multiple occasions that it managed and controlled both Edmond and Oak Hills (collectively, the Facilities).[28] Consistent with these representations, Voyage managed the Facilities' financial obligations to Nursa, including paying its invoices.[29] Voyage employees, including Voyage's Chief Operations Officer, Kip McElwee, and Voyage's Chief Financial Officer, Laura Bufford, also communicated with Nursa on the Facilities' behalf.[30] During all relevant times, McElwee was the regional manager for Voyage, and oversaw the performance of Facility administrators, and managed regulatory issues for Voyage's nursing homes, including the Facilities.[31] All of Voyage's communications with Nursa were

---

[24] *Id.* ¶ 5.

[25] *Id.* ¶ 6. As an unincorporated entity, Oak Hills Care Center is a citizen of every state in which its members are citizens. *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1237 (10th Cir. 2017) ("Supreme Court precedent dictates that the citizenship of any non-corporate entity is determined by considering all of the entity's members.") (cleaned up). Oak Hills Care Center has only one member, Randy Goodman, who is an individual domiciled in Oklahoma. *Complaint* ¶ 7.

[26] *Motion* ¶ 7.

[27] *Id.* ¶ 9.

[28] Dkt. 24, *Opposition to Motion to Dismiss* (*Opposition*) at 3; Dkt. 24-1, *Declaration of Jared Roberts* (*Roberts Declaration*) ¶¶ 11–13; *McElwee Declaration* ¶ 2.

[29] *Opposition* at 3; *Roberts Declaration* ¶¶ 12–13.

[30] *Opposition* at 6; *see also, e.g., Roberts Declaration Ex. 1-A*, Email from Kip McElwee, Chief Operations Officer, Voyage, to josh.richards@nursa.com and billing@nursa.com (Nov. 25, 2022, 9:33 AM) (*McElwee Email*) (regarding Nursa billing invoices). This email was also copied to corp@oakhillscarecenter.com. *McElwee Email.*

[31] *McElwee Declaration* ¶ 9.

directed to Nursa in Utah.[32]  Nursa generated and issued all invoices for the Facilities from Utah.[33]

Multiple Edmond employees used the App.  On May 22, 2021, Lisa Wright, Edmond Facility Administrator,[34] accessed the App.[35]  Tiffany Jones, Edmond Assistant Director of Nursing,[36] used the App on October 12, 2021,[37] and Melisa Dickhage, Edmond Director of Nursing,[38] used the App on September 9, 2022.[39]  McElwee also accessed the App on behalf of Edmond.[40]  To use the App, all of these individuals affirmatively represented Edmond's agreement to the TSA.[41]  These Edmond administrators and directors posted jobs, connected with healthcare providers, and approved Nursa's shift reports through the App on multiple occasions.[42]  Wright posted 1,406 shifts to the App, Jones posted 95 shifts, Dickhage posted 361 shifts, and McElwee posted 601 shifts through the App on behalf of Edmond.[43]  In addition to these individuals, other Edmond representatives posted an additional 19 shifts to the App.[44]  In

---

[32] *Roberts Declaration* ¶ 43.

[33] *Id*. ¶ 44.

[34] *McElwee Declaration* ¶ 4.

[35] *Roberts Declaration* ¶ 15.

[36] *McElwee Declaration* ¶ 5.

[37] *Opposition* at 4; *Roberts Declaration* ¶ 17.

[38] *McElwee Declaration* ¶ 6.

[39] *Opposition* at 4; *Roberts Declaration* ¶ 18.

[40] *Opposition* at 4; *Roberts Declaration* ¶ 19.

[41] *Opposition* at 4; *Roberts Declaration* ¶¶ 17-19.

[42] *Opposition* at 4.

[43] *Id*. at 4–5; *Roberts Declaration* ¶¶ 22–23; *see also* Dkt. 24-4, *Roberts Declaration Ex. 1-C*, *Billing Summary* (including a list of shifts and charges for Edmond's use of the App between October 16, 2021, and April 27, 2023).

[44] *Roberts Declaration* ¶ 24.

total, Edmond posted at least 2,482 shifts, and filled at least 1,647 of those shifts, through the App.[45]

Employees of Oak Hills also used the App.  On June 25, 2021, Seana Sutterfield, Oak Hills Facility Administrator,[46] accessed the App and affirmatively represented Oak Hills' agreement to the TSA.[47]  On July 19, 2021, Shandi King, Oak Hills Assistant Director of Nursing,[48] also accessed the App and similarly represented that Oak Hills agreed to the TSA.[49] McElwee used the App on behalf of Oak Hills in her management capacity.[50]  Through the App, Sutterfield posted 989 shifts, King posted 1,741, and McElwee posted 83 shifts for Oak Hills.[51] Additional individuals posted 198 shifts to the App on Oak Hills' behalf.[52]

Each month, Nursa provided Defendants a monthly statement for each Facility that included a list of outstanding invoices and the total outstanding balance.[53]  Defendants never contested the invoices or reported any errors, omissions, or corrections within the 30-day period required under the TSA.[54]  However, Defendants eventually stopped paying the amounts owed and Nursa terminated Voyage's access to the App.[55]  As of October 31, 2024, Edmond owed Nursa $170,454.04 for services rendered and late fees, Oak Hills owed Nursa $43,610.05 for

---

[45] *Id.* ¶ 25.

[46] *McElwee Declaration* ¶ 7.

[47] *Roberts Declaration* ¶¶ 5, 26–27.

[48] *McElwee Declaration* ¶ 8.

[49] *Roberts Declaration* ¶¶ 5, 28.

[50] *Id*. ¶¶ 29–30.

[51] *Id.* ¶¶ 29–30, 32–33; *see also Opposition Ex. 1-C, Billing Summary* (including a list of shifts and charges for Oak Hills' use of the App between October 2, 2021, and May 4, 2023).

[52] *Roberts Declaration* ¶ 34.

[53] *Complaint* ¶ 42.

[54] *Id.* ¶ 43; *TSA* ¶ 8.8.

[55] *Complaint* ¶¶ 44–45.

services and late fees, and Defendants were no longer responding to Nursa's communications and requests for payment.[56]

On December 4, 2024, Nursa filed its Complaint asserting five claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of contract implied in fact; (4) unjust enrichment; and (5) tortious interference with a contract.[57] On February 20, 2025, Defendants filed their Motion arguing this court lacks personal jurisdiction over Defendants and venue in the District of Utah is improper.[58] The Motion is fully briefed[59] and the court hearing oral argument on September 15, 2025.[60]

## LEGAL STANDARDS

Defendants' Motion challenges both the court's exercise of personal jurisdiction and venue. "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws under the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."[61] "The plaintiff bears the burden of establishing personal jurisdiction,"[62] but it "need only make a prima facie showing" in response to a motion to dismiss.[63] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's

---

[56] *Id*. ¶¶ 46–48.

[57] *See Complaint* ¶¶ 52–87.

[58] *Motion* at 3–9.

[59] *Motion*; *Opposition*; Dkt. 31, *Defendants Edmond Health Care Center, Oak Hills Care Center, and Voyage Long Term Care's Reply to Plaintiff's Opposition* (*Reply*); Dkt. 35, *Surreply Related to Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss* (*Surreply*); Dkt. 36, *Defendants Edmond Health Care Center, Oak Hills Care Center, and Voyage Long Term Care's Response to Plaintiff's Objection to New Evidence and Arguments Raised in Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss* (*Response to Surreply*).

[60] Dkt. 42, *Minute Entry*.

[61] *Benton v. Cameo Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (cleaned up).

[62] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

[63] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citation modified).

affidavits."[64]  A "plaintiff may defeat a motion to dismiss by presenting evidence—either uncontested allegations in its complaint or evidence in the form of an affidavit or declaration— that if true would support jurisdiction over the defendant."[65]  "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[66]

Venue is proper if it "satisfies the requirements of federal venue laws."[67]  Tenth Circuit courts "appear[] to follow the majority rule that a plaintiff bears the burden of proving proper venue."[68]  In meeting this burden, Nursa may rest on any uncontroverted, well-pled facts in its Complaint.[69]

## ANALYSIS

### I.    Personal Jurisdiction

Defendants argue the court must dismiss this case because it does not have personal jurisdiction.[70]  The Supreme Court recognizes two types of personal jurisdiction: 'general' and 'specific'.[71]  "General jurisdiction lies in the forum where the defendant is domiciled or fairly

---

[64] *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 900 (10th Cir. 2017) (citation modified).

[65] *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (citation modified).

[66] *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1131 (10th Cir. 1991) (citation omitted); *see also Dudnikov*, 514 F.3d at 1070 (holding the court must take as true all well-pleaded facts and resolve any factual disputes in the plaintiff's favor).

[67] *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013).

[68] *Cox v. Sullivan*, No. 14-CV-206-TCK-FHM, 2014 WL 4352088, at *2 (N.D. Okla. Sept. 2, 2014) (citing *Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998)); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 1352 (3d ed. 2004) (stating the majority of federal courts impose the burden of proving venue on plaintiffs "in keeping with the rule applied in the context of subject matter and personal jurisdiction defenses").

[69] *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1260 (10th Cir. 2012) ("[A] plaintiff may rest on the well-pled facts in the complaint to oppose a motion to dismiss for improper venue, but only to the extent that such facts are uncontroverted by defendant's evidence.") (cleaned up).

[70] *Motion* at 3–6; *see also* Fed. R. Civ. P. 12(b)(2) (stating lack of personal jurisdiction is an affirmative defense).

[71] *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025).

regarded as at home."[72]  When defendants are "less intimately connected with a State," a court may exercise personal jurisdiction "so long as there exist 'minimum contacts' between the defendant and the forum State."[73]  Sufficient "minimum contacts" exist if the defendant "take[s] some act by which it purposefully avails itself of the privilege of conducting activities within the forum State," and the plaintiff's claims "must derive from, or be connected with those activities."[74]  Only specific personal jurisdiction is at issue here.

There is no simple mechanical or quantitative test for determining sufficient jurisdictional contacts.[75]  Rather, whether due process is satisfied depends on the nature and quality of a defendant's activity in the forum state.[76]  In determining "minimum contacts," courts analyze two factors: (1) "whether the defendant purposefully directed its activities at residents of the forum," and (2) whether the plaintiff's alleged "claims arise out of or results from actions by the defendant himself that create a substantial connection with the forum state."[77]

Defendants contend the court lacks personal jurisdiction because all Defendants are citizens of Oklahoma, and none of them have sufficient minimum contacts with Utah.[78]  Defendants assert they lack minimum contacts because all of the alleged services occurred in Oklahoma, any payments were made from Oklahoma, and any omission of payment occurred in

---

[72] *Id.* (cleaned up).

[73] *Id.* (cleaned up).

[74] *Id.* at 12–13.

[75] *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 319 (1945).

[76] *See id.*

[77] *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

[78] *Motion* at 3–4.

Oklahoma.[79]  Indeed, Defendants maintain "[e]very part of the alleged contract would have been undertaken in the state of Oklahoma, except for receipt of allegedly owed payment to [Nursa.]"[80]

Plaintiff argues Defendants submitted to the court's jurisdiction through the TSA's forum selection clause.  Defendants did not address the forum selection clause in their Motion but argue in Reply that they are not bound by the TSA.  If the forum selection clause is binding, the court need not determine whether Defendants have sufficient minimum contacts with Utah.  Accordingly, the court turns first to the TSA.  Defendants contend the TSA is unenforceable and unconscionable.  The court addresses each in turn.

### A.  The TSA Is Enforceable

Defendants contend the TSA is unenforceable against Defendants because, to the extent anyone affiliated with Defendants agreed to the TSA, they were not authorized to do so.[81]  In Utah, there is a "general presumption that contractual provisions are enforceable."[82]  Clickwrap agreements, like the one at issue here, "are increasingly common and have routinely been upheld."[83]  "Federal and state courts typically evaluate clickwrap agreements by applying state

---

[79] *Id.* at 5.

[80] *Id.*

[81] *Reply* at 1–8.  Nursa argues the court should not consider any new arguments or evidence Defendants asserted in their Reply.  *See generally Surreply.*  Defendants maintain they did not make new arguments or offer new evidence, rather they "replied to new facts and arguments presented" in Nursa's Opposition that Defendants were not previously aware of.  *Response to Surreply* at 1.  The court agrees that Defendants raised new arguments—namely, that the TSA is unenforceable and unconscionable—in their Reply.  As a general rule, the court will not consider any new arguments raised in a reply.  *See Watts-Klien v. Marriott Vacation Club*, No. 2:19-cv-00872-JNP-JDB, 2021 WL 3909878, at * 2 (D. Utah Aug. 31, 2021) (declining to address new arguments raised in reply because they were "not properly before the court").  However, because Nursa responded to Defendants' new arguments in its Surreply, the court concludes it is appropriate to consider all of Defendants' arguments.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) (stating that when movants present new arguments or evidence in reply, the district court may either permit the plaintiff to respond in a surreply or refrain from relying on any new material in its decision).

[82] *Com. Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 285 P.3d 1193, 1201 (Utah 2012).

[83] *Hancock v. Amer. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012); *see also id.* at 1255 ("Clickwrap is a commonly used term for agreements requiring a computer user to consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with a transaction.") (cleaned up).

law contract principles."[84]  "Under Utah law, contract formation in general requires merely that the proponent of the contract prove 'an offer, an acceptance, and consideration' by a preponderance of the evidence."[85]  "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made."[86]

There is little Utah case law on clickwrap agreements.  However, the TSA likely is enforceable because, "[u]nder Utah law, each party has the burden to read and understand the terms of a contract before he or she [agrees] to it.  A party may not [enter into] a contract and thereafter assert ignorance or failure to read the contract as a defense."[87]  Before any person affiliated with Edmond or Oak Hills could access or use the App, they had to view the TSA and click "I Agree" on the page where the TSA is presented to the user.[88]  The TSA provides:

> You acknowledge that you are entering into this Agreement either by clicking "I agree" at the bottom of this Agreement, by any use of the Nursa Program, by signing and acknowledging this Agreement, and / or creating a profile in the Nursa Platform as a Clinician or a Facility.  In doing so, you expressly acknowledge that you understand this Agreement in its entirety and accept all of its terms and conditions.  If you do not agree to be bound by the terms and conditions of this Agreement, you shall not use or access our Platform or any of the services provided through our Platform.  Unless otherwise designated, each term, condition, or obligation as stated herein shall apply to and be binding upon each Clinician and Facility.[89]

Defendants do not dispute that individuals affiliated with Edmond and Oak Hills accessed and used the App.[90]  However, Defendants argue the TSA is unenforceable because "[n]one of

---

[84] *Hancock*, 701 F.3d at 1256.

[85] *Pagano v. NordicTrack, Inc.*, 749 F.Supp.3d 1183, 1190 (D. Utah 2024) (quoting *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012)).

[86] *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995).

[87] *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 193 (Utah 2010).

[88] *Complaint* ¶¶14, 16–19.

[89] *TSA* ¶ 2.2.

[90] *See Reply* at 1–2.

those persons had actual or apparent authority to bind [the Facilities] to contractual agreements."[91]  Rather, "[t]he only person/role authorized to contractually bind Edmond Health or Oak Hills to a valid contractual agreement is Brad Underwood, chief executive officer and owner of Voyage."[92]

"It is well established that, 'under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority.'"[93]  Actual authority may be express or implied.[94]  An agent has express authority when a principal directly states, "its agent has the authority to perform a particular act on the principal's behalf."[95]  Implied authority "embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent."[96]  In other words, when an employee is tasked with performance of certain business, the employee carries such authority by implication "to do collateral acts which are the natural and ordinary incidents of the main act or business authorized."[97]  Further, in assessing whether an agent had actual authority to sign contracts, the "inquiry turns on the reasonableness of the agent's belief she possessed sufficient authority."[98]

---

[91] *Id.* at 1.

[92] *McElwee Declaration* ¶ 12.

[93] *Stein Eriksen Lodge Owners Ass'n Inc. v. MX Techs. Inc.*, 508 P.3d 138, 146 (Utah Ct. App. 2022) (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1998)) (cleaned up).

[94] *Zions First Nat'l Bank*, 762 P.2d at 1094.

[95] *Id.*

[96] *Id.* at 1094.

[97] *Id.* at 1095.

[98] *Stein Erickson Lodge Owners Ass'n Inc.*, 508 P.3d at 147 (citing Restatement (Third) of Agency § 2.01 (Am. L. Inst. 2006) ("An agent acts with actual authority when . . . the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.")).

An agent "must subjectively hold the belief that she possesses authority, and that belief must be objectively reasonable in light of the principal's actions."[99]

Nursa alleges that Wright, Jones, Dickhage, Sutterfield, King, and McElwee all accessed and used the App to fill staffing needs at Edmond and Oak Hills.[100]  At all relevant times, Wright was the Facility Administrator at Edmond and "manage[d] nursing home facility finances and operation[s]."[101]  Jones was the Assistant Director of Nursing at Edmond responsible for billing "performed services."[102]  Dickhage was the Director of Nursing at Edmond responsible for "overseeing clinical patient care."[103]  Sutterfield was the Facility Administrator at Oak Hills who managed Oak Hills' finances and operations.[104]  King was the Assistant Director of Nursing at Oak Hills responsible for billing "performed services."[105]  McElwee was the Regional Manager for Voyage, "tasked with overseeing the technical performance of facility administrators and managing regulatory issues concerning Voyage's nursing homes, including Edmond Health and Oak Hills."[106]

Defendants acknowledge Wright, Jones, Dickhage, Sutterfield, King, and McElwee all held managerial roles with "authority to oversee and manage current company operations and obligations."[107]  But Defendants contend all individuals who accessed and used the App were not

---

[99] *Id*.

[100] *Roberts Declaration* ¶¶ 15–30.

[101] *McElwee Declaration* ¶ 4.

[102] *Id*. ¶ 5.

[103] *Id*. ¶ 6.

[104] *Id*. ¶ 7.

[105] *Id*. ¶ 8.

[106] *Id*. ¶ 9.

[107] *McElwee Declaration* ¶ 11 ("Facility administrators, directors of nursing, and assistant directors of nursing for Edmond Health and Oak Hills, as well as regional managers for Voyage . . . [held] roles [that] are managerial in nature, only having authority to oversee and manage current company operations and obligations."); *see also Reply* at 1 (stating Wright was a facility administrator for Edmond  tasked with managing operations, Dickhage was

authorized to contract on behalf of Edmond, Oak Hills, or Voyage.[108]  Rather Defendants argue

the only person who had the authority to bind the Facilities is Voyage's CEO Underwood.[109]

That may be sufficient to demonstrate the management employees lacked express authority, but

it is insufficient to establish that implied consent was absent.

Defendants do not argue or contest that the managers believed they had the authority "to

do collateral acts" which were natural, necessary, or ordinary to fulfill their responsibilities.[110]

Indeed, the Facility managers and administrators who used the App had to affirmatively

represent they had the authority to use it.  The TSA stated:

> By agreeing to this Agreement, by any use of the Nursa Platform, or by creating a profile
> in the Nursa Platform, you represent that you . . . have the legal capacity and authority,
> consent, or agency to enter into this Agreement on behalf of yourself the Facility entity,
> or any other entity on behalf of whom you are signing.  We assume no responsibility or
> liability for any misrepresentation of your . . . authority.[111]

Notably, no fewer than six separate management and director level employees of Edmond and

Oak Hills apparently believed and understood they had authority to agree to the TSA terms as

evidenced by the fact all six separately and independently did so.

---

director of nursing at Edmond tasked with overseeing clinical patient care, McElwee was regional administrator for
Edmond tasked with overseeing the technical performance of facility administrators and managing regulatory
issues); *id.* at 1–2 (stating Wright, Jones, Dickhage, McElwee, and "unnamed others" "held express and implied
authority to manage and oversee current operations"); *id.* at 2 (stating Sutterfield was facility administrator for Oak
Hills tasked with managing operations; King was assistant director of nursing for Oak Hills who managed billing of
performed services; McElwee was regional administrator tasked with overseeing the facility performance and
regulatory issues for Oak Hills).

[108] *Id.* ¶ 11; *Reply* at 1 ("Plaintiff lists numerous persons who interacted with its app and allegedly entered into its
Terms of Service Agreement ('TSA') on the Facilities' behalf.  None of those persons had authority to enter such
agreements on the Facilities' behalf.").

[109] *McElwee Declaration* ¶ 12.

[110] *Zions First Nat'l Bank*, 762 P.2d at 1094; *see also Posner v. Equity Title Ins. Agency, Inc.*, 222 P.3d 775, 780
(Utah Ct. App. 2009).

[111] *TSA* ¶ 2.1.

Further, the billing administrators and Voyage were aware of the Facilities' ongoing use of the App to fulfill their staffing needs.[112]  Indeed, the Facilities paid Nursa for services through the App for some time and never objected to the contractual obligation or asserted a lack of authority to use the App to manage staffing needs.[113]  Accordingly, the court concludes Plaintiff has satisfied its burden at this stage of the proceeding to show personal jurisdiction is appropriate under the terms of the TSA.

### B.    The TSA Is Not Unconscionable

Defendants also argue the TSA is unconscionable.[114]  Specifically, Defendants contend (1) the TSA's language and structure makes it difficult to understand[115]; (2) the terms are one-sided; and (3) the TSA is "molded with deceptive practices."[116]

"A party claiming unconscionability bears a heavy burden."[117]  "The law enables parties to freely contract," including entering "into unreasonable contracts or contracts leading to a hardship on one party."[118]  However, a contract may be unconscionable if it presents "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."[119]

---

[112] *See McElwee Email*; *Roberts Declaration Ex. 1-A* (Edmond billing invoice for Nursa services in October and November 2022); *Roberts Declaration Ex. 1-C* (Edmond billing statement for Nursa services between October 2021 and May 2023); *Roberts Declaration Ex. 1-D* (email regarding Oak Hills invoices from Nursa between May 2021 and October 2022).

[113] *Complaint* ¶¶ 35–44.

[114] *Reply* at 3–5.

[115] *Id.* at 3.

[116] *Id.* at 3–5.

[117] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998).

[118] *Id.*

[119] *Id.*

Utah courts analyze unconscionability by examining procedural unconscionability and substantive unconscionability.[120]  Procedural unconscionability "focuses on the formation of the agreement," and substantive unconscionability looks to the contents of the agreement.[121]  While it is possible a contract could be procedurally unconscionable alone, that would be rare.[122]  But a "substantive unconscionability alone may support a finding of unconscionability."[123]

    *i.*    *The TSA Is Not Procedurally Unconscionable*

In determining procedural unconscionability, courts consider the following factors: (1) "whether each party had a reasonable opportunity to understand the terms and conditions of the agreement"; (2) "whether there was a lack of opportunity for meaningful negotiation"; (3) "whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position"; (4) "whether the terms of the agreement were explained to the weaker party"; (5) "whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement"; and (6) "whether the stronger party employed deceptive practices to obscure key contractual provisions."[124]

Defendants do not contest they had a reasonable opportunity to understand the terms and conditions of the TSA.[125]  Nor do they argue Nursa was a stronger party that should have explained the TSA to Defendants.[126]  However, Defendants argue the TSA is a "form contract"

---

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Comm Real Estate Inv., L.C.*, 285 P.3d at 1203.

[124] *Sosa v. Paulos*, 924 P.2d 357, 362 (Utah 1996).

[125] *Reply* at 4–5.

[126] *Id.*

that left "no room for negotiation" and used "cloudy formatting" to obscure the forum-selection provision.[127]  Specifically, Defendants complain:

> The provision starts by telling a reader that **all claims** are to be settled by arbitration/mediation.  It then lists several claims governed by federal and state law that cannot be subject to arbitration/mediation and sneaks in Nursa's primary claim[128] that it would have in this mass of text toward the tend of the TSA, where a user would be too mentally exhausted by that point to even catch such hidden provisions.  This placement and mental exhaustion prevents a user from having a reasonable opportunity to understand the terms—even if they were even able to spot it.[129]

The court is not persuaded.  First, Defendants reference paragraph 15.6, a paragraph that concerns arbitration—an issue that is not currently before the court.[130]  Paragraph 20—a separate, short paragraph labeled "Governing Law and Consent to Jurisdiction" in bolded, capital letters—clearly states, "The Parties hereby submit to the jurisdiction of the state and federal courts in Salt Lake County, Utah, and agree that said courts have the sole and exclusive jurisdiction over any and all disputes and causes of action involving such Party that arise out of or relate to this Agreement or its performance."[131]  Further, one party to a contract "does not have a duty to ensure that the other party has a complete and accurate understanding of all terms" contained in the contract.[132]  Instead, each party bears the burden of reading and understanding

---

[127] *Id.*

[128] Defendants do not state what Nursa's "primary claim" is.  *See id.* at 5.

[129] *Id.* at 4–5.

[130] *See TSA* ¶ 15.6 ("Limitation on how this Arbitration Agreement Applies and Claims not Covered by this Arbitration Agreement," a subsection of ¶ 15, "Mediation and Arbitration").

[131] *TSA* ¶ 20.1.

[132] *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207–08 (Utah 1987).

the terms of a contract before agreeing to it.[133]  "A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense."[134]

The parties do not dispute that the TSA is a form contract that Defendants had to unilaterally accept to use the App.  However, a form contract drafted by one party is not, by itself, procedurally unconscionable.  For example, courts have determined form employment contracts drafted by an employer and not subject to negotiation are not unconscionable.[135]  Based on the information and arguments presented to the court, the court concludes Defendants have not met their burden to demonstrate the TSA is procedurally unconscionable.

### ii.    The TSA Is Not Substantively Unconscionable

Substantive unconscionability concerns the contents of the agreement, "examining the relative fairness of the obligations assumed."[136]  In determining substantive unconscionability, Utah courts consider whether the "terms are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain."[137]  These factors are considered in the context of "the mores and business practices of the time and place."[138]

Defendants make essentially the same arguments for substantive unconscionability as those for procedural unconscionability.  Specifically, they argue the TSA is structured in such a

---

[133] *Id.* at 1208.

[134] *Id.*; *see also Garff Realty Co. v. Better Bldgs., Inc.* 234 P.2d 842, 844 (Utah 1951) ("If a man acts negligently and in such a way as to justify others in supposing that the writing is assented to by him, he will be bound both at law and in equity.").

[135] *See Miller v. Corinthian Colls., Inc.*, 769 F.Supp.2d 1336, 1347–48 (D. Utah 2011) (concluding a form college enrollment agreement, like an employment contract, was not procedurally unconscionable); *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402–04 (Utah 1998) (upholding a unilateral employment contract); *Hancock*, 701 F.3d at 1256–58 (concluding a unilateral clickwrap agreement was valid and enforceable).

[136] *Sosa*, 924 P.2d at 361 (cleaned up).

[137] *Id.* (cleaned up).

[138] *See id.* at 362 (cleaned up).

way as to obscure the forum selection clause and compelling arbitration for all claims except any related to billed expenses is "extremely one-sided."[139]  Defendants state the TSA obscures the forum selection terms by presenting the user "with an 11,000+ word [agreement] to view on a small mobile screen," the forum selection clause appears after 6,600+ words, and the clause first addresses arbitration before listing claims not subject to arbitration.[140]  The court rejects this argument for the same reasons stated above.  A party to a contract "has the burden to read and understand the terms of a contract" before agreeing to it.[141]  Additionally, "a conclusion that a term is potentially advantageous to one side or unreasonable is insufficient, standing alone, to support a determination of substantive unconscionability."[142]  As Nursa points out, "Defendants are sophisticated business entities operating in a highly regulated industry."[143]  Defendants have not met their burden in demonstrating the TSA presents such an unfair balance in the rights and obligations of the parties as to be unconscionable.[144]

Having determined the TSA is likely enforceable and not unconscionable, the forum-selection clause is likely valid.  At least at this stage of the proceeding, Plaintiff has met its burden to show that by accepting the TSA, Defendants submitted to the "sole and exclusive jurisdiction" of the "state and federal courts in Salt Lake County, Utah" to litigate Nursa's TSA-related claims.[145]  Defendants' Rule 12 challenge to personal jurisdiction fails.[146]

---

[139] *Reply* at 4.

[140] *Id.* at 3–4.

[141] *John Call Eng'g*, 732 P.2d at 1208.

[142] *Sosa*, 924 P.2d at 362.

[143] *Surreply* at 8.

[144] *See Sosa*, 924 P.2d at 361–62.

[145] *TSA* ¶ 20.1.

[146] At oral argument, Defendants requested that, if the court were inclined to deny the Motion, Defendants be granted leave to conduct jurisdictional discovery.  *See* Dkt. 42, *Minute Entry*.  The court denies this request.  "The burden of demonstrating a legal entitlement to jurisdictional discovery—and the related prejudice flowing from the

## II.    Venue

Defendants also argue venue is improper in Utah because the court lacks personal jurisdiction, all Defendants reside in Oklahoma, and none of the alleged events or omissions occurred in Utah.[147]  Nursa contends venue is proper in Utah because the forum selection clause mandates litigation in Utah and, by agreeing to the forum selection clause, Defendants "effectively exercised its 'venue privilege' before [the] dispute [arose.]"[148]

The Supreme Court has clarified that a forum selection clause cannot determine venue. Venue is governed solely by 28 U.S.C. § 1391(b); "[w]hether the parties entered into a contract containing a forum-selection cause has no bearing on whether the case falls into" the parameters of § 1391(b).[149]  Under 28 U.S.C. § 1391(b), venue is proper in: (1) "a judicial district in which

---

discovery's denial—is on the party seeking the discovery."  *Grynberg v. Ivanhoe Energy, Inc.*, 490 Fed. App'x 86, 103 (10th Cir. 2012) (cleaned up).  Defendants have not demonstrated they are legally entitled to discovery.  Indeed, Defendants did not include a request or argument concerning jurisdictional discovery in their briefs, and "[i]ssues raised for the first time at oral argument are considered waived."  *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 18).  Additionally, Defendants do not argue that Nursa has failed to allege sufficient facts to support jurisdiction; rather, Defendants disagree with the substance of the allegations.  Nursa bears the burden of establishing jurisdiction, and at the motion to dismiss stage of a proceeding, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion."  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  To the extent Defendants dispute Nursa's jurisdictional allegations, the court must resolve any factual disputes in Plaintiff's favor.  *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (stating that, in considering a motion to dismiss for lack of personal jurisdiction, the court "tak[es] as true all well-pled facts alleged in [a plaintiff's] complaint . . . [and] any factual disputes in the parties' affidavits must be resolved in [the plaintiff's] favor").  Further, Defendants seek jurisdictional discovery to determine the validity of the TSA.  As Nursa's claims largely stem from the TSA, jurisdictional discovery encompasses discovery on the merits.  Permitting duplicative discovery would not promote a speedy, inexpensive, and efficient resolution of the matter.  *See Benson v. Hartford Life & Acc. Ins. Co.*, No. 2:10-cv-00275-TS, 2011 WL 285831, at *4 (D. Utah Jan. 28, 2011) (stating Federal Rule of Civil Procedure 26(b)(2) governs the scope of discovery and "protects against . . . overly burdensome discovery requests, discovery of duplicative materials, and overly costly discovery requests").  For these reasons, the court concludes granting jurisdictional discovery is inexpedient.  Defendants may contest the validity of the TSA in a motion for summary judgment or at trial.

[147] *Motion* at 8.

[148] *Opposition* at 8 (quoting *Atl. Marine*, 571 U.S. at 63–64).

[149] *Atl. Marine*, 471 U.S. at 55.  The parties disagree whether the holding in *Atlantic Marine* is binding in this case.  Plaintiff maintains the parties' choice of venue alone may govern by distinguishing the question presented in *Atlantic Marine*: "[U]nlike here, *Atlantic Marine* confronted a situation where the plaintiffs failed to bring an action in the forum to which the parties had agreed. . . .  [and] *Atlantic Marine* is inapposite in cases where the plaintiffs filed suit in the venue mandated by the forum-selection clause").  Dkt. 38, *Notice of Supplemental Authorities Re Plaintiff's Opposition to Motion to Dismiss* at 2 (cleaned up).  In response, Defendants point out that federal courts' interpretations of *Atlantic Martine* are erratic and inconsistent nationwide and argue "*Atlantic Marine* should be

any defendant resides, if all defendants are residents of the State in which the district is located";
(2) "a judicial district in which a substantial part of the events or omissions giving rise to the
claim occurred"; or, (3) if neither (1) or (2) is satisfied, "any judicial district in which any
defendant is subject to the court's personal jurisdiction with respect to such action."[150]

Nursa's Complaint alleges venue under 28 U.S.C. § 1391(b)(2) "because a substantial
part of the events or omissions giving rise to the claim occurred" in the District of Utah, and
under 28 U.S.C. § 1404 "because the parties have already contractually consented to venue in
this district."[151]  The court is not persuaded venue is proper under § 1391(b)(2), because virtually
all of Defendants' activities occurred in Oklahoma, and venue may not be established under
§ 1404.[152]

Nursa's claims are based on the following acts or omissions by Defendants: (1)
Defendants downloaded the App and agreed to the TSA; (2) Defendants utilized the App to fill
their staffing needs at Edmond and Oak Hills; (3) Defendants failed to fulfill their obligations

---

understood by its plain text." Dkt. 39, *Defendants Edmond Health Care Center, Oak Hills Care Center, and Voyage Long Term Care's Response to Plaintiff's Supplemental Authority*, at 3–4.  As other courts have pointed out, *Atlantic Marine* does not address the situation we have here—where a plaintiff files a case in the forum provided for in a forum selection clause.  *See e.g.*, *Nursa, Inc. v. ST. Cloud Rochelle Park, LLC*, No. 2:24-cv-00631-JNP-JCB (D. Utah Aug. 14, 2025).  However, none of the cases Plaintiff cites contradict *Atlantic Marine*'s holding that a forum selection clause, by itself, may not make an otherwise make an improper venue proper.  In *Atlantic Marine*, the parties' forum selection clause did not address jurisdiction.  *See Atl. Marine*, 571 U.S. at 53 (stating only that all disputes "shall be litigated in the Circuit Court for the City of Norfolk, Virginia").  In all of the cases Plaintiff cites to argue a forum selection clause may govern venue, the forum selection clause at issue also established jurisdiction, or the court had already concluded it had personal jurisdiction, so venue comported with § 1391(b).  *See Barresi v. Lynx Restoration Grp., Inc.* No. 1:24-CV-1541-MSN-WEF, 2025 WL 138427, at *3 (E.D. Va. Apr. 9, 2025), *report and recommendation adopted*, No. 1:24-CV-1541-MSC-WEF, 2025 WL 1384273 (E.D. Va. May 13, 2025) ("[T]he Court has proper personal jurisdiction over [the defendant] by virtue of the forum selection clause."); *Apollo Holding Co., LLC v. Roe*, No. CV 24-2773, 2025 WL 1474738, at *6 (E.D. La. May 22, 2025) (concluding the court has personal jurisdiction over the defendant); *Huawei Tech. Co., Ltd. v. Yiren Huang*, 2018 WL 1964180, at *7–8 (E.D. Tex. Apr. 25, 2018) (agreeing that a forum-selection clause cannot establish venue in an improper venue under § 1391, but concluding venue was proper based on permissive waiver).  In other words, none of the cases stand for the proposition that a forum-selection clause may establish venue in contravention of § 1391(b).

[150] 28 U.S.C. § 1391(b).

[151] *Complaint* ¶ 3.

[152] *See Motion* at 8.

under the TSA by refusing to pay for services Nursa rendered through the App.[153]  All of these

acts or omissions *giving rise to the claim* occurred in Oklahoma.  Absent Defendants' acceptance

of the TSA and failure to make payments on alleged contractual obligations, this case would not

exist.[154]  Accordingly, the court concludes venue is not proper under § 1391(b)(2).  Additionally,

28 U.S.C. § 1404 is the mechanism whereby a party may enforce a forum selection clause,[155] but

§ 1404 does not secure venue.[156]

        If the court were to rely solely on § 1391(b)(2) and § 1404, the court would have to

dismiss or transfer the case given the Supreme Court's unequivocal reading of 28 U.S.C.

§ 1391.[157]  However, § 1391 goes on to say that an entity defendant "shall be deemed to reside

. . . in any judicial district in which such defendant is subject to the court's personal jurisdiction

with respect to the civil action in question."[158]  Defendants are entities and, because the court

concludes they are likely subject to the personal jurisdiction of the court by virtue of agreeing to

the TSA, they are residents of Utah under § 1391(c)(2) for purposes of venue.[159]  And venue is

proper in Utah when all defendants are residents of the State.[160]  Although Nursa did not plead

venue under § 1391(b)(1) and § 1391(c)(2), the court concludes it is appropriate to determine

venue based on the statute as a whole to avoid the "judicial jiu-jitsu" of transferring the case to

---

[153] *See Complaint* ¶¶ 9–51.

[154] *See Leroy v. Great Western United Corp.*, 443 U.S. 173, 185–86 (1979) (concluding venue was improper in Texas under § 1391(b) because it was the actions by defendants in Idaho that "provide[d] the basis" for the claim).

[155] *Atl. Marine*, 571 U.S. at 59–60.

[156] *Id*. at 56 ("When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b).  If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a).").

[157] *See id.*

[158] *Id.* § 1391(c)(2).

[159] *See id.*

[160] 28 U.S.C. § 1391(b)(1).

Oklahoma only to have Nursa move to transfer the case back to the District of Utah under 28 U.S.C. § 1404(a).[161]  Because Defendants signed the forum selection clause submitting to the court's jurisdiction, venue is statutorily proper under § 1391(b)(1) and (c)(2), and "the facts of this case do not require such a judicial boomerang."[162]  Accordingly, the court declines to dismiss the case for improper venue.

## CONCLUSION

For the reasons stated above, the court DENIES Defendants' Motion to Dismiss.[163]

DATED this 19th of September 2025.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[161] *See Nursa, Inc. v. ST. Cloud Rochelle Park*, No. 2:24-cv-00630-JNP-JCB, 2025 WL 2374374, at *7 (Whether venue is proper is determined exclusively under § 1391(b), and whether venue is convenient is determined under § 1404(a).  A forum-selection clause does not affect the propriety of venue under § 1391(b) (except through the venue statute's residency provisions), but it does waive a party's right to challenge venue as inconvenient under § 1404(a).").

[162] *Id.*

[163] Dkt. 17.